**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TOM SORENSEN, individually and on behalf of all others similarly situated | |
| Plaintiff, | Case No. 1:22-cv-5522 |
| v. | |
| TURNER BROADCASTING SYSTEM, INC. d/b/a BLEACHER REPORT, INC. | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiff Tom Sorensen ("Plaintiff"), individually and on behalf of all other persons similarly situated, files this Class Action Complaint against Defendant Turner Broadcasting System, Inc. ("Defendant" or "Bleacher Report") for violations of the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Plaintiff's claims arise from Defendant's practice of knowingly disclosing to a third party, Meta Platforms, Inc. ("Facebook"), data containing Plaintiff's and other digital-subscribers Class Members' (i) personally identifiable information or Facebook ID ("FID") and (ii) the computer file containing video and its corresponding URL viewed ("Video Media") (collectively, "Personal Viewing Information"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

**NATURE OF THE ACTION**

1.      This is a consumer privacy action against Turner Broadcasting System, Inc. for violating the VPPA by disclosing its digital subscribers' identities and Video Media to Facebook without proper consent.

1

2.      The VPPA prohibits "video tape service providers," such as Bleacher Report, from knowingly disclosing consumers' personally identifiable information, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without express consent in a standalone consent form.

3.      Like other businesses with an online presence, Defendant collects and shares the personal information of visitors to its website and mobile application ("App") with third parties. Defendant does this through cookies, software development kits ("SDK"), and pixels. In other words, digital subscribers to Bleacher Report have their personal information disclosed to Defendant's third-party business partners.

4.      Bleacher Report collects and shares subscribers' personal information using a "Facebook Pixel." A Facebook Pixel is a snippet of programming code that, once installed on a webpage or mobile application, tracks users as they navigate through a website or app and sends information regarding the user's activity to Facebook.

5.      In this case, the information shared with Facebook includes the title of the video the subscriber watched, and most notably, the subscribers' FID. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interest, work history, relationship status, and other details.

6.      Importantly, Bleacher Report discloses the subscriber's FID and viewed Video Media to Facebook together in a single transmission. This occurs even when the digital subscriber has not shared (nor consented to share) such information. Because the subscriber's FID uniquely identifies an individual's Facebook user account, Facebook—or any other ordinary person—can use it to quickly and easily locate, access, and view subscriber's Facebook profile. In other words,

2

the Facebook Pixel allows Facebook to know what Video Media one of its users has viewed on Bleacher Report's digital platforms.

7.      Bleacher Report subscribers do not consent to the dissemination of their viewed Video Media to a third party through a standalone consent form, as required by the VPPA. As a result, Bleacher Report violates the VPPA by disclosing this information to Facebook.

8.      Defendant chose to disregard Plaintiff's and hundreds of thousands of other Bleacher Report subscribers' statutorily protected privacy rights by releasing their sensitive data to Facebook. Accordingly, Plaintiff brings this class action for legal and equitable remedies to redress and put a stop to Defendant's practices of intentionally disclosing its subscribers' Personal Viewing Information to Facebook in knowing violation of VPPA.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

10.     This Court also has jurisdiction under 28 U.S.C. § 1332(d) because this action is a class action in which the aggregate amount in controversy for the proposed Class (defined below) exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

11.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 because Defendant does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District.

## THE PARTIES

12.     Plaintiff Tom Sorensen is a natural person and a citizen of the State of Illinois. Plaintiff has visited BleacherReport.com since at least 2015 and upon information and belief became a digital subscriber at or around that time. Plaintiff has had a Facebook account from approximately October 2011 to the present. During the relevant time period he has used his BleacherReport.com digital subscription to view Video Media through BleacherReport.com while logged into his Facebook account. By doing so, Plaintiff's Personal Viewing Information was disclosed to Facebook pursuant to the systematic process described herein. Plaintiff never gave Defendant express written consent to disclose his Personal Viewing Information.

13.     Defendant Turner Broadcasting System, Inc.:

   a. Is a television and media conglomerate owned by Warner Bros. Discovery, Inc. headquartered at 1 CNN Center, Atlanta, Georgia, 30303.

   b. Bleacher Report, Inc. is a Delaware corporation with its principal place of business at 153 Kearny Street, San Francisco, California, 94108.

   c. In August 2012, Turner Broadcasting System, Inc. acquired Bleacher Report for approximately $175 million.[1]

   d. BleacherReport.com receives more than 60 million unique monthly visitors.[2]

   e. BleacherReport.com includes a Videos section which provides a broad selection of video content.

   f. BleacherReport.com is used by numerous U.S. digital media viewers.

   g. Through BleacherReport.com and accompanying app, Defendant delivers and, indeed, is in the business of delivering countless hours of video content to its digital subscribers.

---

[1] *See* "Turner Buys Bleacher Report, Next-Gen Sports Site, for $175M-Plus", *available at* https://www.forbes.com/sites/jeffbercovici/2012/08/06/turner-buys-bleacher-report-next-gen-sports-site-for-175m-plus/?sh=4115d6407843 (last accessed October 6, 2022)

[2] *See* "Bleacher Report Hits a Home Run with Microservices and New Relic" *available at* https://newrelic.com/customers/bleacher_report#:~:text=Founded%20in%202007%2C%20Bleacher%20Report,sports%20website%20in%20the%20world. (last accessed October 6, 2022)

## FACTUAL BACKGROUND

**I.    Turner Broadcasting System, Inc.'s Digital Subscriptions**

14.    Defendant owns and operates a www.bleacherreport.com, a website geared towards providing articles, podcasts, and video content to users, on sport and sports culture. It also offers an App available for download on Android and iPhone devices.

15.    In order to post any "User Content" or access certain features on Bleacher Report's website or mobile application, users of the website or mobile application must register for an account with Bleacher Report.[3]

16.    To register for a Bleacher Report account, users provide their personal information, including but not limited to their name and phone number.

17.    Bleacher Report also offers subscriptions to several online newsletters. To register for a newsletter, Bleacher Report users provide their personal information, including but not limited to their email address.

18.    On information and belief, all subscribers provide Defendant with their IP address, which is a unique number assigned to all information technology connected devices, that informs Defendant as to subscribers' city, zip code and physical location.

19.    Subscribers may provide to Defendant the identifier on their mobile devices and/or cookies stored on their devices.

20.    When opening a Bleacher Report account or subscribing to a newsletter, Defendant does not disclose to its subscribers that it will share their Personal Viewing Information with third

---

[3] *See* Terms of Use, *available at* https://bleacherreport.com/pages/terms.

parties, such as Facebook. Subscribers are also not asked to consent to such information sharing upon opening an account.

21.     After becoming a subscriber, viewers have access to a variety of Video Media on Defendant's digital platforms.

22.     Notably, once a subscriber signs in and watches Bleacher Report Video Media, the subscriber is not provided with any notification that their Personal Viewing Information is being shared. Similarly, Defendant also fails to obtain subscribers' written consent to collect their Personal Viewing Information "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer," as the VPPA requires.

## II.     Defendant Admits It Collects and Discloses Personal Viewing Information of Digital Subscribers to Third Parties.

23.     The operative Privacy Policy for Bleacherreport.com states that it collects "Information about your use of, or participation in an Offering" from its users including:

> "information about whether you have opened an email we have sent you, how you (including any account you use) interact with a Digital Service, content that you have viewed or posted, advertisements you have interacted with, games you have played and the level you reached, your preferences and interest in and use of various features, programs, services and content available on a Digital Service. This may also include demographic information, including at an individual or household level."[4]

24.     Defendant's Privacy Policy further states that Bleacher Report, third party service providers, and partners:

> "may use 'cookies' or similar technologies, such as pixels and SDKs to (i) provide, develop, maintain, personalize, protect, and improve our Digital Services and their content (ii) perform analytics, including to analyse and report on usage and performance of our Digital Services and any advertisements displayed on or delivered by or through them (iii) protect against, identify, and prevent fraud and other unlawful activity (iv) create aggregate data about groups or categories of our users (including advertising audiences), and (v) for us, our partners and third party service providers to deliver, target, offer, market, or personalise advertising relating

---

[4] *See* https://www.warnermediaprivacy.com/policycenter/b2c/en-row/

to our Offerings or the offerings of our clients and partners (including limiting how often you see an advertisement)."

25.     Importantly however, the VPPA requires that consent be obtained in a form "distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710. Subscribers to Bleacher Report are not given a standalone or any consent form disclosing Defendant's practices at issue and requesting subscriber consent. Hence, no subscriber has consented to Bleacher Report's offending practice of sharing video preferences with third parties.

## III.     How Defendant Disseminates Subscribers' Personal Viewing Information

### 1.     Tracking Pixels

26.     Websites and apps use Facebook's pixel and SDK to collect information about users' devices and activities and send that to Facebook. Facebook then uses that information to show the user targeted ads.

27.     The Facebook tracking pixel, also known as a "tag" or "web beacon" among other names, is an invisible tool that tracks consumers' actions on Facebook advertisers' websites and reports them to Facebook. It is a version of the social plugin that gets "rendered" with code from Facebook. To obtain the code for the pixel, the website owner tells Facebook which website events it wants to track (e.g., Video Media) and Facebook returns corresponding Facebook pixel code for the advertiser to incorporate into its website.

28.     Facebook benefits from websites like Bleacher Report installing its Pixel. When the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook or other Meta-owned platforms, like Instagram. In addition, even if the business does not advertise with Facebook, the Pixel assists Facebook in building more fulsome profiles of its own users, which in turn allows Facebook to profit from providing more targeted ads. The Pixel

is installed on websites all over the internet and, accordingly, provides Facebook with information about its users' preferences, other distinguishing traits, and web-browsing activities outside of Meta-owned platforms.

29.     Using the Facebook pixel likewise benefits Bleacher Report by improving its ability to promote its content and services to its subscribers.

30.     Defendant installed the Facebook tracking pixel, which enables it to disclose Plaintiff's and Class Members' Personal Viewing Information to Facebook, because it benefits financially from the advertising and information services that stem from use of the pixel. When a Bleacher Report subscriber enters the website or App and watches Video Media, the website or App sends to Facebook certain information about the viewer, including, but not limited to, their identity and the media content the digital subscriber watched. Specifically, Bleacher Report sends to Facebook the video content name, its URL, and, most notably, the viewers' Facebook ID.

**2.  Facebook ID ("FID")**

31.     An FID is a unique and persistent identifier that Facebook assigns to each user. With it, anyone ordinary person can look up the user's Facebook profile and name. When a Facebook user with one or more personally identifiable FID cookies on their browser views Video Media from Bleacher Report on the website or app, Bleacher Report, through its website code, causes the digital subscriber's identity and viewed Video Media to be transmitted to Facebook by the user's browser. This transmission is not the digital subscriber's decision, but results from Defendant's purposeful use of its Facebook tracking pixel by incorporation of that pixel and code into Bleacher Report's website or App. Defendant could easily program the website and App so that this information is not automatically transmitted to Facebook when a subscriber views Video

Media. However, it is not Defendant's financial interest to do so because it benefits financially by providing this highly sought-after information.

32.     Notably, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Facebook admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile. Simply put, with only an FID and the video content name and URL—all of which Defendant knowingly and readily provides to Facebook without any consent from the digital subscribers—any ordinary person could learn the identity of the digital subscriber and the specific video or media content they requested from Bleacher Report.

33.     At all relevant times, Defendant knew that the Facebook pixel disclosed Personal Viewing Information to Facebook. This was evidenced from, among other things, the functionality of the pixel, including that it enabled Bleacher Report's website and accompanying App to show targeted advertising to its digital subscribers based on the products those digital subscribers had previously viewed on the website, including Video Media consumption, for which Defendant received financial remuneration.

## IV.   Defendant Unlawfully Discloses Its Subscribers' Personal Viewing Information to Facebook.

34.     Defendant maintains a vast digital database comprised of its digital subscribers' Personal Viewing Information, including the names and e-mail addresses of each digital subscriber and information reflecting the Video Media that each of its digital subscribers viewed.

35.     Defendant is not sharing anonymized, non-personally identifiable data with Facebook. To the contrary, the data it discloses is tied to unique identifiers that track specific Facebook users. Importantly, the recipient of the Personal Viewing Information—Facebook—

9

receives the Personal Viewing Information as one data point. Defendant has thus monetized its database by disclosing its digital subscribers' Personal Viewing Information to Facebook in a manner allowing it to make a direct connection—without the consent of its digital subscribers and to the detriment of their legally protected privacy rights.

36.     Critically, the Personal Viewing Information Defendant discloses to Facebook allows Facebook to build from scratch or cross-reference and add to the data it already has in their own detailed profiles for its own users, adding to its trove of personally identifiable data.

37.     These factual allegations are corroborated by publicly available evidence. For instance, as shown in the screenshot below, a user visits Bleacher Report's website and clicks on a video titled "Taylor Rooks X Bradley Beal".



*Pictured above: The video titled "Taylor Rooks X Bradley Beal"*
*(taken from Bleacherreport.com on or about October 6, 2022).*

38.     As demonstrated below, once the user clicks on and watches the video, Bleacher Report sends to Facebook the content name of the video the subscriber watched, the URL, the subscriber's FID, and indicates that the subscriber has played the video.



*HTTP single communication session sent from the device to Facebook, reveals the video name, URL, and the viewer's FID (c_user field)*

39.     As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Facebook for its own personal profit the Personal Viewing Information of Defendant's digital subscribers, together with additional sensitive personal information.

40.     Defendant does not seek its digital subscribers' prior written consent to the disclosure of their Personal Viewing Information (in writing or otherwise) and its subscribers remain unaware that their Personal Viewing Information and other sensitive data is being disclosed to Facebook.

41.     By disclosing its digital subscribers Personal Viewing Information to Facebook – which undeniably reveals their identity and the specific video materials they requested from Defendant's website – Defendant has intentionally and knowingly violated the VPPA.

## V.    Plaintiff's Experience

42.    Plaintiff Tom Sorensen has been a subscribed to a Bleacher Report account since at least 2015. Plaintiff became a subscriber of Bleacher Report by providing, his name, email address, and any cookies associated. Plaintiff has subscribed to several of Bleacher Report's online newsletters since at least October of 2022.

43.    Plaintiff has had a Facebook account since approximately May of 2011. From at least 2015 to the present, Plaintiff viewed Video Media via Bleacher Report's website.

44.    Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Facebook. Plaintiff has never been provided written notice that Defendant discloses its digital subscribers' Personal Viewing Information, or any means of opting out of such disclosures of his Personal Viewing Information. Defendant nonetheless knowingly disclosed Plaintiff's Personal Viewing Information to Facebook.

45.    Because Plaintiff is entitled by law to privacy in his Personal Viewing Information, Defendant's disclosure of his Personal Viewing Information deprived Plaintiff of the full set of benefits to which he is entitled. Plaintiff did not discover that Defendant disclosed his Personal Viewing Information to Facebook until October 2022.

## CLASS ACTION ALLEGATIONS

46.    Plaintiff brings this action individually and on behalf of all others similarly situated as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Class"):

> All persons in the United States with a digital subscription to an online website owned and/or operated by Defendant that had their Personal Viewing Information disclosed to Facebook by Defendant.

12

47.     Excluded from the Class are Defendant, their past or current officers, directors, affiliates, legal representatives, predecessors, successors, assigns and any entity in which any of them have a controlling interest, as well as all judicial officers assigned to this case as defined by 28 USC § 455(b) and their immediate families.

48.     This action is properly maintained as a class action under Federal Rules of Civil Procedure 23(a) because:

> A.     The class is so numerous that joinder of all members is impracticable;
>
> B.     There are questions of law or fact that are common to the class;
>
> C.     The claims of the Plaintiff are typical of the claims of the class; and,
>
> D.     The Plaintiff will fairly and adequately protect the interests of the class.

### Numerosity

49.     Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds of thousands of members of the Class widely dispersed throughout the United States. Class members can be identified from Defendant's records and non-party Facebook's records.

### Typicality

50.     There is a well-defined commonality of interest in the substantial questions of law and fact concerning and affecting the Class in that Plaintiff and all members of the Class have been harmed by Bleacher Report's failure to comply with the VPPA. The common questions of law and fact include, but are not limited to the following:

> A.     Whether Defendant knowingly disclosed Class members' Personal Viewing Information to Facebook;
>
> B.     Whether the information disclosed to Facebook concerning Class members' Personal Viewing Information constitutes personally identifiable information under the VPPA;

C.      Whether Defendant's disclosure of Class members' Personal Viewing Information to Facebook was knowing under the VPPA;

D.      Whether Class members consented to Defendant's disclosure of their Personal Viewing Information to Facebook in the manner required by 18 U.S.C. § 2710(b)(2)(B); and

E.      Whether the Class is entitled to damages as a result of Defendant's conduct.

51.     Plaintiff anticipates that Bleacher Report will raise defenses that are common to the class.

## Adequacy

52.     Plaintiff will fairly and adequately protect the interests of all members of the class, and there are no known conflicts of interest between Plaintiff and the class members. Plaintiff, moreover, has retained experienced counsel that are competent in the prosecution of complex litigation and who have extensive experience acting as class counsel.

## Typicality

53.     Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused Personal Viewing Information to be disclosed to Facebook without obtaining express written consent. His claims are based on the same legal theories as the claims of other Class members.

## Predominance and Superiority

54.     The common questions identified above predominate over any individual issues, which will relate solely to the quantum of relief due to individual class members. A class action is superior to other available means for the fair and efficient adjudication of this controversy because individual joinder of the parties is impracticable. Class action treatment will allow a large number

of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense if these claims were brought individually. Moreover, as the damages suffered by each class member are relatively small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it difficult for individual class members to vindicate their claims.

55.     Additionally, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially more than if claims are treated as a class action. Prosecution of separate actions by individual class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Turing and/or substantially impair or impede the ability of class members to protect their interests. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

## **FIRST CAUSE OF ACTION**

### **Violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710**

56.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

57.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

58.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

59.     Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

60.     As defined in 18 U.S.C. § 2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

61.     Defendant knowingly caused Personal Viewing Information, including FIDs, concerning Plaintiff and Class members to be disclosed to Facebook. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to Facebook as an individual who viewed Bleacher Report's Video Media, including the specific video materials requested from the website.

62.     As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff subscribed to Bleacher Report's newsletter that provides Video Media content to the digital subscriber's desktop, tablet, and mobile device. Plaintiff is thus a "consumer" under this definition.

63.     As set forth in 18 U.S.C. § 27109(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner." Defendant failed to obtain informed, written consent under this definition.

64. In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

65. By disclosing Plaintiff's and the Class's Personal Viewing Information, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

66. As a result of the above violations, Defendant is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500 per plaintiff." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Tom Sorensen respectfully requests that this Court enter and Order:

A. Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Tom Sorensen as Class Representative, and appointing Stephan Zouras, LLP as Class Counsel;

B. Declaring that Turner Broadcasting System, Inc.'s actions, as set forth above, violate the VPPA, 18 U.S.C. § 2710(c)(2)(D);

C. Awarding statutory damages of $2,500 to Plaintiff and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

D. Awarding punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

E.      Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

F.      Awarding Plaintiff and the Class their reasonable attorneys' fees and other litigation expenses, 18 U.S.C. § 2710(c)(2)(C);

G.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

H.      Awarding such other and further relief as equity and justice may require.


Date:   October 7, 2022                        Respectfully Submitted,

                                               */s/ Ryan F. Stephan*
                                               Ryan F. Stephan
                                               James B. Zouras
                                               **STEPHAN ZOURAS, LLP**
                                               100 N. Riverside Plaza, Suite 2150
                                               Chicago, Illinois 60606
                                               312.233.1550
                                               312.233.1560 *f*
                                               rstephan@stephanzouras.com
                                               jzouras@stephanzouras.com
                                               Firm ID: 43734

                                               Brandon M. Wise – IL Bar # 6319580
                                               Adam Florek – IL Bar # 6320615
                                               **PEIFFER WOLF CARR**
                                               **KANE CONWAY & WISE, LLP**
                                               73 W. Monroe, 5th Floor
                                               Chicago, IL 60604
                                               T: 312-444-0734
                                               bwise@peifferwolf.com
                                               aflorek@peifferwolf.com


                                               **ATTORNEYS FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I, the attorney, hereby certify that on October 7, 2022, I filed the attached with the Clerk of the Court using the electronic filing system which will send such filing to all attorneys of record.

*/s/ Ryan F. Stephan*